IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-02271-PAB-BNB

TWO MOMS AND A TOY, LLC, a Colorado limited liability company,

      Plaintiff,

v.

INTERNATIONAL PLAYTHINGS, LLC, a Delaware limited liability company,
GOLOS WEISMAN DESIGN, LTD., an Israel partnership, and
YOOKIDOO, LTD., an Israel partnership,

      Defendants.

---

## ORDER REGARDING CLAIM CONSTRUCTION

---

      This matter is before the Court on the Supplemental Motion for Summary

Judgment [Docket No. 167] filed by defendant International Playthings, LLC ("IPT").

Plaintiff Two Moms and a Toy, LLC ("Two Moms") brought suit against defendants IPT,

Golos Weisman Design, Ltd. ("GWD"), and Yookidoo, Ltd. ("Yookidoo"), charging that

two toys sold by defendants infringe U.S. Patent No. 6,782,567 (the "'567 patent").[1]

IPT's motion argues that Claims 1, 13, and 17 of the '567 patent are invalid because

they are obvious and anticipated in light of the prior art.

      Before addressing the invalidity issues, the Court will determine the meaning of

certain disputed terms in the contested claims. *See Freedman Seating Co. v. Am.*

*Seating Co.*, 420 F.3d 1350, 1356-57 (Fed. Cir. 2005) ("Patent infringement is a two

---

[1]The '567 patent was applied for by and issued to inventors Linda Austin and
Anne Argent, who assigned the patent to Two Moms.  Docket No. 119 at 5-6, ¶¶ 10.

step inquiry.  First, the court must construe the asserted claim[s] . . . Second, the court

must determine whether the accused product or process contains each limitation of the

properly construed claims.") (internal citations omitted).  Claim construction is a

question of law for the court.  *See, e.g., Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d

1448, 1454 (Fed. Cir. 1998) (en banc).

## I.  BACKGROUND

The '567 patent abstract states, in part, as follows:

> A fountain water toy generally for use in a bathtub or pool is described.
> The toy generally comprises an at least partially submersible pump that is
> fluidly coupled with a fountain amusement assembly.  The assembly
> includes one or more spouts through which water is streamed.
> Interchangeable character heads or other fanciful representations are
> provided to place over the spouts such that when in operation water
> streams from the character heads.

U.S. Patent No. 6,782,567 (abstract) (filed November 3, 2003).

Claim 1 describes:

> 1.  A water toy comprising:

> an at least partially submersible battery-powered fluid pump;
> a themed amusement assembly, the amusement assembly
> including (1) at least one spout out of which water streams when the toy is
> in operation; and (2) at least one character removably mounted over the
> at least one spout, wherein water appears to stream from the character
> when the toy is in operation; and a fluid conduit connecting the fluid pump
> and the amusement assembly.

'567 patent col. 10 ll. 44-54.

Claim 13 describes:

> 13.  A water toy comprising:

> a battery-operated pump; a themed faceplate assembly separate from the
> pump, the faceplate assembly including (1) a faceplate, (2) one or more
> fluid passages terminating in an outlet, wherein the portion of the

2

faceplate assembly immediately surrounding the outlet is configured to resemble a character; (3) one or more connectors adapted to removably secure the face plate assembly to a generally vertical surface; and tubing fluidly connecting the faceplate assembly and the pump.

'567 patent col. 11 ll. 24-35.

Claim 17 describes:

17.   A water toy comprising:

an at least partially submersible battery-operated pump, the pump including one or more suction cups adapted to removably secure the pump to a surface; a faceplate assembly, the faceplate assembly including (1) a faceplate, (2) at least one spout out of which water streams when the toy is in operation; (3) at least one character removably mounted over the at least one spout, wherein water appears to stream from the character when the toy is in operation; and (4) one or more suction cups adapted to removably secure the faceplate assembly to a generally vertical surface; and tubing fluidly coupling the faceplate assembly and the pump.

'567 patent col. 12 ll. 8-23.

Plaintiff contends that the following phrases require construction by the Court: "water toy," "faceplate," "faceplate assembly," and "at least one character removably mounted over the at least one spout."

IPT additionally asks the Court to construe the following claim language: "character" and "wherein the portion of the faceplate assembly immediately surrounding the outlet is configured to resemble a character."

## II.  LEGAL STANDARDS FOR PATENT CLAIM CONSTRUCTION

In construing patent claims, courts are guided by the precedent of the Federal Circuit.  *See SunTiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1333 (Fed. Cir. 1999).  As that court explained, "there is no magic formula or catechism for conducting claim construction."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir.

2005) (en banc).  Even so, the *Phillips* decision outlined several key sources and doctrines that should be consulted and applied, all the while making clear that "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."  *Id*.

Courts begin with the "bedrock principle" that "the claims of the patent define the invention to which the patentee is entitled the right to exclude."  *Id*. at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The words of the claims "are generally given their ordinary and customary meaning," *id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Id*. at 1313; *see CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally speaking, [courts] indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.").

When the claim language "involves little more than the application of the widely accepted meaning of commonly understood words," construction is relatively straightforward and the "ordinary meaning . . . may be readily apparent even to lay judges."  *Phillips*, 415 F.3d at 1314.  However, when the claim terms have a particular meaning in the field, courts "look[] to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean."  *Id*. (quoting *Innova*, 381 F.3d at 1116).  These sources include the "words of

the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

Importantly, claim terms are not read in a vacuum. *Id.* at 1313. The context in which a term is used, both in the asserted claim as well as in other claims of the patent, can be valuable and instructive. *Id.* at 1314. In addition, the patent specification – the text and figures of the patent that precede the claims – "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). However, the "claim requirement presupposes that a patent applicant defines his invention in the claims, not the specification." *Johnson & Johnston Assocs., Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002); *see PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1359 (Fed. Cir. 2004) ("the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly") (citation omitted).

Courts also consider the patent's prosecution history – the official record of the patent application and subsequent process before the U.S. Patent and Trademark Office ("PTO"). *Phillips*, 415 F.3d at 1317. That history "provides evidence of how the PTO and the inventor understood the patent." *Id.* However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, . . . it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

5

Courts may consult extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises." *Id*. However, this evidence is "less significant than the intrinsic record," i.e., the specification and prosecution history, *id*. (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F3d 858, 862 (Fed. Cir. 2004)), and courts must be wary not to use extrinsic evidence to override the meaning of the claim terms demonstrated by the intrinsic evidence. *Id*. at 1318-19. "[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id*. at 1319.

In sum, a court's basic role is to construe the claim terms as they would be viewed by "the ordinary artisan after reading the entire patent." *Id*. at 1321. This is crucial in order to respect the public notice function of patents:

> The patent system is based on the proposition that claims cover only the invented subject matter. As the Supreme Court has stated, "[i]t seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent."

*Id*. at 1321 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 573-74 (1876)). With these principles in mind, the Court turns to the claim construction issues presented in this case.

## III.  ANALYSIS

### A.  Water Toy

The bodies of Claims 1, 13, and 17 do not use the term "water toy." Rather, the term is found in the preamble to those claims.

Plaintiff proposes the following construction for "water toy": "a toy which is played

with by a user who is physically located in a body of water such as a pool or bath tub."

Docket No. 191 at 4.  In addition, IPT contends that the use of "water toy" in the

preamble is not a narrowing limitation because it does not describe the essential

structure of the claimed invention.  Docket No. 209 at 5.  As a general rule, the

preamble does not limit a patent claim.  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299

F.3d 1336, 1346 (Fed. Cir. 2002).  Typically, a preamble is not regarded as a limitation

to a claim "when the claim body describes a structurally complete invention such that

deletion of the preamble phrase does not affect the structure or steps of the claimed

invention."  *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358-59 (Fed. Cir.

2010).  Nonetheless, the preamble may be limiting "if it recites essential structure or

steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Catalina*

*Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citation

omitted).

IPT also claims that the narrow construction proposed by plaintiff contradicts

embodiments found in the specification.  Docket No. 209 at 4 (citing '567 patent col. 8 ll.

58-62 ("in other variations of the water toy, the pump can be positioned outside of the

water, such as on the edge of a tub or pool, wherein another fluid flow conduit extends

from the pump to the pool of water to suck water therefrom.")).

The Court finds that the preamble "water toy" is not a limitation for Claims 1, 13,

and 17 of the '567 patent.  First, the reference to "water toy" in the preamble of these

claims is not essential to understanding the limitations or terms in the body of the

claims.  *Catalina Mktg.*, 289 F.3d at 808.  Second, the body of Claims 1, 13, and 17

describes a structurally complete invention that is not affected by the deletion of the

7

preamble. *Biolitec*, 618 F.3d at 1359.  Third, even if the term "water toy" was read as part of the body of these claims, there is no support for the limitation of the user being physically located in a body of water with the invention.  Finally, there is no evidence that the preamble "water toy" was used in order to distinguish this invention from the prior art. *Id.*[2]  Therefore, the Court rejects plaintiff's proposed construction and determines that there is no need to construe the term "water toy" in the preamble of Claims 1, 13, and 17.

## B.  Faceplate

The word "faceplate" appears in Claims 13 and 17 on multiple occasions, both as an adjective modifying the word "assembly" and as a noun.  Plaintiff asks the Court to construe "faceplate" as "a generally vertically disposed faceplate."  Docket No. 66 at 10.  In support of this construction, plaintiff claims that the patent uses the term in connection with embodiments where the faceplate is "removably secured to a generally vertical surface." *Id.*  The defendant opposes this construction, arguing that dictionaries typically define the term faceplate to mean "a protective plate for a machine or device."  Docket No. 77 at 9 (citation omitted).  IPT contends that there is nothing in the specification of the '567 patent which suggests that the term "faceplate" should be accorded any meaning other than its ordinary dictionary meaning. *Id.*  Furthermore, IPT asserts that narrowing the term "faceplate" to include "generally vertically disposed" will make the limitations in Claims 13 and 17 redundant. *Id.* at 10.

---

[2] For example, the specification of the '567 patent lists U.S. Patent No. 5,385,472 (the "'472 patent") as prior art.  '567 patent col. 1 ll. 24-25.  The '472 patent describes an "educational water toy designed for mounting on a vertical surface, such as a bathtub wall."  '472 patent (abstract) (filed July 26, 1993) [Docket No. 48-7 at 8].

Although there is a presumption that a claim term carries its ordinary and customary meaning, a patentee may choose to be her own lexicographer and use terms in a manner other than their ordinary meaning. *Vitronics*, 90 F.3d at 1582. The specification acts as a dictionary when it expressly defines the terms used in the claims or when it defines terms by implication. *Id*.

The Court rejects plaintiff's proposed construction, which attempts to import a limitation divorced from any reasonable meaning of the word "faceplate." The fact that the described embodiments contain faceplates secured to "a generally vertical surface" means that a faceplate, once secured, is positioned vertically, not that the word "faceplate" as used in the claim language makes a faceplate inherently or necessarily positioned vertically. The common meaning of faceplate does not connote a vertical positioning.

The defendant proposes that the word "faceplate" be defined as "a generally flat, plate-like object to facilitate the positioning and placement of 'spouts' and/or 'water outlets.'" Docket No. 209 at 5. However, such a definition would appear to contradict the use of the word "faceplate" in Claim 13, wherein the faceplate, as part of the "faceplate assembly," is "configured to resemble a character." As a result, the faceplate would not be "generally flat" or "plate-like" as defendant suggests. However, the Court believes that the remainder of the defendant's proposed definition is generally accurate and thus will construe the term "faceplate" to mean "an object to facilitate the positioning or placement of 'fluid passages,' 'tubing,' 'spouts,' and/or 'water outlets.'"

### C.   Faceplate Assembly

Plaintiff proposes the following construction for "faceplate assembly," a term

which is found in Claims 13 and 17: "a generally vertically disposed faceplate assembly." Docket No. 66 at 9.  In support of its construction, plaintiff argues that the embodiments and figures described in the '567 patent refer to the faceplate assembly in connection with vertical surfaces and are shown as such in the figures describing the patent. *See, e.g.,* '567 patent col. 4 ll. 45-47 (the "faceplate assembly is typically adapted to attach to a vertical surface"); *id*. col. 6 ll. 64-67 (the faceplate assembly is "to be attached to a generally vertical surface comprised of a smooth nonporous material, such as the sides of a bathtub").

The Court will not adopt plaintiff's proposed construction.  As is obvious from the component parts of the "faceplate assembly" as (differently) described in Claims 13 and 17, the "faceplate assembly" consists of more than a vertical positioning.  Instead, it consists of a faceplate; fluid passages, tubing, outlets, and/or spouts; a character or something resembling a character positioned over a water outlet or spout; and connectors or suction cups to secure the faceplate assembly to a generally vertical surface.  Given that Claims 13 and 17 contain a description of the components of the "faceplate assembly" and given that those descriptions of the components differ as between Claims 13 and 17, the Court finds no need to construe this term since the construction is obvious from each claim.

### D.   At Least One Character Removably Mounted Over the at Least One Spout

Plaintiff proposes the following construction of the term "at least one character removably mounted over the at least one spout," which is found in Claims 1 and 17: "a character designed to be secured by the toy in its mounted position over the spout while

water streams from the character but also designed to be removable from the toy and its mounted position over the spout by a user playing with the toy."[3]  Docket No. 191 at 6.  In support of its construction, plaintiff argues that this construction gives meaning to the words "removably" and "mounted."  *Id*.  Plaintiff contends that construing this phrase to mean "designed to be secured by the toy in its mounted position over the spout while water streams from the character" is consistent with the specification which describes a "conical mount . . . adapted to securely hold a removable character . . . thereon while water flows through the mount and the associated character to form a water feature." '567 patent col. 5 ll. 52-54.

IPT proposes the following alternative construction: "[a]t least one character mounted above, surrounding or covering a water outlet/spout in such a way as to be capable of being removed without damaging the surrounding structure."  Docket No. 209 at 4.  IPT contends that the term "removably mounted" should be given its ordinary meaning of "mounted so as to be capable of being removed."  Docket No. 77 at 7.  In support, IPT claims that the written claim description contrasts placement of characters which are "removable" with characters that are "integrally molded" with the activity center.  '567 patent col. 3 ll. 19-22.

The Court agrees with plaintiff that the term "mounted" is generally described in

---

[3]Plaintiff provided two earlier constructions of this phrase.  *See, e.g.*, Docket No. 66 at 10 ("at least one character removably mounted over the at least one spout **wherein said character is intended to be removable from its mounting over the spout by a user of the toy**") (emphasis in original); Docket No. 98 at 4 ("at least one character removably mounted over the at least one spout **wherein said character is 'designed' to be removable from its mounting over the spout by a user of the toy**") (emphasis in original).  The Court will focus on the proposed construction found in plaintiff's response to the supplemental motion for summary judgment [Docket No. 191].

11

the specification as "securely hold[ing] a removable character." '567 patent col. 5 ll. 52-53; *id*. col. 6 ll. 1-2 ("removable character is snapably received within the annular valley of the mount and is securely held in place").  However, plaintiff's proposed limitation of "while water streams from the character" is unsupported and would render Claims 1 and 17 redundant.[4]  Therefore, the Court will construe "mounted" to mean "securely held," but the Court rejects plaintiff's proposed construction of "while water streams from the character."

Next, plaintiff proposes that the term "removably" be construed to mean "designed to be removable from the toy and its mounted position over the spout by a user playing with the toy."  Docket No. 191 at 6.  Plaintiff claims that the limitation of "a user playing with the toy" is consistent with the specifications teaching that "a user interacts with the toy."  '567 patent col. 5 ll. 21-25.  IPT argues that the root word "remove" carries the meaning of "taking away from a position without damaging the surrounding structure" and does not limit removal to the user of the toy.  Docket No. 77 at 7-8.

The Court agrees with IPT that the phrase "removably mounted over the at least one spout" does not limit the identity of "who" can remove a character.  The reference to a caregiver in the specification, *see* '567 patent col. 7 ll. 32-34 ("[b]y being able to change the characters on a periodic basis a caregiver can help ensure the water toy

---

[4]If the Court accepted plaintiff's construction, Claims 1 and 17 would define, in pertinent part: "a character designed to be secured by the toy in its mounted position over the spout *while water streams from the character* but also designed to be removable from the toy and its mounted position over the spout by a user playing with the toy, *wherein water appears to stream from the character* when the toy is in operation" (emphasis added).

remains interesting to a child"), is inapposite because Claims 1 and 17 do not identify or otherwise mention the user of the toy and only describe the structure of the claimed invention.  To the extent plaintiff seeks to add a limitation to Claims 1 and 17 based on the aforementioned specification language, the Court finds this improper.  *See Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (courts are not to import limitations from the specification into the claims).  Therefore, the Court rejects plaintiff's proposed construction that the removal of a character must be by a "user playing with the toy."

With respect to the term "removably," the specification uses several terms when it discusses the attachment of removable characters.  *See* '567 patent col. 7 ll. 23-25 ("[i]n the preferred embodiments, the characters are interchangeable from one conical mount to another"); *id*. col. 7 ll. 32-34 ("[b]y being able to change the characters on a periodic basis"); *id*. (abstract) ("Interchangeable characters heads or other fanciful representations").  Based on these descriptions, the Court will construe "removably" to mean "interchangeable with another character."

Next, plaintiff proposed that the term "over" should be construed to mean "above, below and to the side of the spout and all positions in between."  Docket No. 98 at 5. IPT submits that the word "over" should be construed as "above" or otherwise accorded its ordinary meaning given that there is no indication that it has been given a technical definition.  Docket No. 77 at 8.

In support of its definition, plaintiff relies on two characters – the waterwheel and the reservoir – that are found "below" an outlet and to the side of the spout or outlet. '567 patent col. 5 ll. 42-47 ("In another variation as shown in Fig. 1, a reservoir . . .

13

having an outlet hole . . . located underneath the reservoir and directly above the waterwheel is provided.  The reservoir can be integrally molded with the faceplate or it can be separately molded and subsequently attached to the front face thereof.").

The Court finds plaintiff's argument unconvincing.  Plaintiff's reliance on the location of the "waterwheel" and the "reservoir" is unavailing because those characters are not removable characters.  As the specification states, "removable characters associated with the water toy have depressions formed into their backsides that substantially correspond to the conical mounts."  '567 patent col. 5 ll. 62-65.  The waterwheel and the reservoir are "integrally molded" with the faceplate and do not otherwise have "depressions formed into their backsides" nor are they attached on mounts.  '567 patent col. 5 ll. 34-36 (the waterwheel is received on to "a post "); *id*. col. 5 ll. 44-47 ("[t]he reservoir can be integrally molded with the faceplate or it can be separately molded and subsequently attached to the front face thereof").

In addition, the specification teaches that the faceplate includes mounts for "attaching the one or more characters to the faceplate."  '567 patent col. 5 ll. 24-25; *id*. (abstract) ("characters heads or other fanciful representations are provided to place over the spouts").  In the specification, the mounts have a passage "extending down the center of the mount from the rear face and out the front face at a water outlet (or spout)."  '567 patent col. 5 ll. 28-30.  In addition, the mounts have an "annular valley" which extends from a large diameter close to the front surface of the faceplate extending to a small diameter, *id*. col. 5 ll. 56-59, in which the "depression in the removable character is snapably received within the annular valley of the mount and is securely held in place by the annular ridge of the mount."  '567 patent col. 5 l. 67 - col. 6

14

l. 3; *id*. col. 2 ll. 26-29 ("The character is removably mountable over the spout such that water appears to stream from the character when the toy is in operation").  Because the spouts are holes at the end of mounts and mounts help to securely hold characters through the annular valley, the Court finds that the term "over" in this instance should be accorded its ordinary meaning.  *CCS Fitness*, 288 F.3d at 1366 ("Generally speaking, [courts] indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.").

Based on the aforementioned reasons, the Court construes the phrase "at least one character removably mounted over the at least one spout" to mean "at least one character that is securely held over at least one spout and which is interchangeable with another character."

### E.   Character

IPT proposes the following construction for "character," a word found in Claims 1, 13, and 17: "any representation of an animate or inanimate object or a portion thereof that is in some manner set apart from its surroundings."  Docket No. 48 at 11.  Plaintiff argues that this term does not require construction because it is defined in the patent. Docket No. 98 at 7.  The Court agrees with plaintiff.  Because the patent provides a specific definition for the term "character," *see* '567 patent col. 3 l. 66 - col. 4 l. 2 ("any representation of an animate or inanimate object or a portion thereof that is in some manner set apart from its surroundings"), the Court finds no reason to construe this term.  *Vitronics*, 90 F.3d at 1582 ("although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer

and use terms in a manner other than their ordinary meaning").

### F.   Wherein the Portion of the Faceplate Assembly Immediately Surrounding the Outlet is Configured to Resemble a Character

IPT proposes the following construction of the term "wherein the portion of the faceplate assembly immediately surrounding the outlet is configured to resemble a character," which is found in Claim 13: "the part of the faceplate assembly enclosing the spout looks like a character and the character may be removable or 'integrally molded' with the assembly."  Docket No. 77 at 10.  Plaintiff argues that the Court need not construe this phrase outside of the construction of "faceplate assembly."  Docket No. 98 at 7.

With respect to the word "spout" used in this phrase, IPT states that the specification teaches the terms "spout" and "outlet" are interchangeable.  Docket No. 77 at 11.  Plaintiff claims that "outlet" and "spout" are not synonymous.  Generally, the presumption is that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claim.  *Fin Control Sys. PTY, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001).  Here, however, "spout" and "outlet" do not have the same meaning.  Although "spout" and "water outlet" are sometimes used in conjunction with one another in the specification, *see, e.g.,* '567 patent col. 4 ll. 47-51 ("water from a pool in which the pump is positioned is pumped through the tubing to the faceplate and out of the faceplate assembly through one or more water outlets (or spouts) of the water features"); *id*. col. 3 ll. 53-55 ("when the water outlets or spouts are vertically level with the pump outlet and an

output of 125 gallons per hour when the spouts are up to about two feet above the pump outlet"), the term "water outlet" is sometimes used by itself, *see, e.g., id.* col. 5 ll. 55-57 ("the conical mount . . . extending from a small diameter end 215 at an associated water outlet 170"); col. 7 ll. 41-42 ("different types of nozzles can be attached proximate the ends of the water outlets 170"), and is not used in Claims 1, 13, and 17.  Moreover, the specification uses the terms "water outlet," "pump outlet," "outlet hole," and "outlet" to define different functions.  *See, e.g., id.* col. 5 ll. 42-45 ("a reservoir having an outlet hole located underneath the reservoir"); *id.* col. 5 ll. 47-49 ("when a user manually fills the reservoir with water, water flows from the outlet hole to impact the vanes"); col. 6 ll. 13-15 ("the water exiting the outlet does not contact or flow through the character directly").

Because the term "spout" and "outlet" are not used interchangeably, the use of the term "outlet" in Claim 13 and "spout" in Claims 1 and 17 indicates that these terms were intended to have different meanings.  An "outlet," as described in the specification, defines a passage through which water exits.  By contrast, Claims 1 and 17 describe a "spout" as something "out of which water *streams* when the toy is in operation."  '567 col. 10 ll. 48-49 (emphasis added); *id.* col. 12 ll. 14-15.  The use of the term "streams" describes that water exits a "spout" at a terminal point of the water feature.  An outlet does not necessarily share this characteristic.

Based on the foregoing, the Court construes "wherein the portion of the faceplate assembly immediately surrounding the outlet is configured to resemble a character" to mean "where a portion of the faceplate directly above or around the outlet is configured to resemble a removable character or one integrally molded."

17

### G.  Conclusion

In sum, the Court will construe the requested phrases as follows:

Faceplate: an object to facilitate the positioning or placement of fluid passages, tubing, spouts, and/or water outlets.

At least one character removably mounted over the at least one spout: at least one character that is securely held over at least one spout and which is interchangeable with another character.

Wherein the portion of the faceplate assembly immediately surrounding the outlet is configured to resemble a character: where a portion of the faceplate directly above or around the outlet is configured to resemble a removable character or one integrally molded.

## IV.  INVALIDITY

IPT seeks an order from the Court that: (1) Claim 1 of the '567 patent is invalid as anticipated under 35 U.S.C. § 102; and (2) Claims 1, 13, and 17 of the '567 patent are invalid as obvious under 35 U.S.C. § 103.  The Court addresses these arguments in turn.

### A.  Anticipation

IPT argues that Claim 1 of the '567 patent is anticipated by three pieces of prior art: (1) United States Patent No. 5,918,809 (the "'809 patent") [Docket No. 167-1]; (2) China Patent Application CN2351170Y (the "'170 application") [Docket No. 167-2];[5] and

---

[5]Two Moms does not dispute that the '170 application and the '550 application are "printed publications" as that term is defined in 35 U.S.C. §§ 102(a), (b).  *See SRI Int'l Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194-95 (Fed. Cir. 2008) (determination of whether prior art is a "printed publication" involves a case-by-case

(3) China Patent Application CN2528505Y (the "'505 application") [Docket No. 167-3].[6]

A patent issued by the PTO is presumed valid.  35 U.S.C. § 282.  However, a

patent may be found invalid as a matter of law if it is anticipated.  35 U.S.C. § 102.[7]  A

patent is anticipated if a single prior art reference discloses, expressly or inherently,

every limitation of the claim such that a person of ordinary skill in the art could practice

the invention without experimentation.  35 U.S.C. § 102(b); *see also Advanced Display*

*Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).  The anticipating

reference must describe the patented features "with sufficient clarity and detail" such

that a person of ordinary skill in the field would recognize the existence of the patent

---

inquiry into the facts and circumstances surrounding the reference's disclosure to persons of skill in the art); *see also In re Wyer*, 655 F.2d 221, 226 (C.C.P.A. 1981) (finding an Australian patent application was open to the public because it was "properly classified, indexed, or abstracted").

[6]For invalidity, the relevant prior art "must have existed as of the date of invention, presumed to be the filing date of the application until an earlier date is proved." *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir. 1986).  IPT claims that November 3, 2003, the filing date for the '567 patent, is the appropriate date of invention.  Docket No. 167 at 5-6.  Two Moms disputes this date, but does not otherwise provide an alternative date or evidence of an alternative date.  *See* Docket No. 191 at 1.  Because Two Moms does not provide corroborating evidence of a different invention date, the Court finds that there is no material dispute of fact and will apply an invention date of November 3, 2003 for the '567 patent.  *Bausch*, 796 F.2d at 449; *Procter & Gamble v. Teva Pharms. U.S.A., Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009) (it is well established that when a party seeks to prove conception via the oral testimony of a putative inventor, the party must proffer evidence corroborating that testimony).

[7]35 U.S.C. § 102 states, in relevant parts, that: "[a] person shall be entitled to a patent unless . . . (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the application for patent, or (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102.

features in the reference. *Crown Operations Int'l v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). "[A]ll of the elements and limitations of the claim must be shown in a single prior reference, arranged as in the claim." *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). Moreover, there must be no difference between the claimed invention and the prior art reference, as viewed by a person of ordinary skill in the field of the invention. *In re Omeprazole Patent Litig.*, 483 F.3d 1364 (Fed. Cir. 2007). Although anticipation relies on factual determinations, the Court may properly grant summary judgment based on anticipation if the underlying factual inquiries present no genuine factual issues. *Beckson Marine, Inc. v. NFM, Inc.*, 292 F.3d 718, 723 (Fed. Cir. 2002).

For the purposes of this case, the parties agree that the level of skill in the art necessary to construe these patents is low. IPT submits that a person of ordinary skill in the art is one who has "experience in designing toys, having at least a rudimentary knowledge of mechanical and battery-powered components used for the design of toys." Docket No. 48 at 15. Because Two Moms does not object to this definition, the Court will adopt IPT's proposed definition for purposes of this motion.

As discussed above, Claim 1 of the '567 patent discloses four elements: (1) an at least partially submersible battery-powered fluid pump; (2) a themed amusement assembly, the amusement assembly including at least one spout out of which water streams when the toy is in operation; (3) at least one character that is securely held over at least one spout and which is interchangeable with another character, wherein water appears to stream from the character when the toy is in operation; and (4) a fluid conduit connecting the fluid pump and the amusement assembly. '567 patent col. 10

20

ll. 45-54.  To prevail on its counterclaim of anticipation, IPT must establish by clear and convincing evidence that either the '809 patent, the '170 application, or the '505 application discloses each of the four elements contained in Claim 1 of the '567 patent as arranged in that Claim.  *See Crown Packaging Tech. Inc. v. Ball Metal Bev. Container Corp.*, 635 F.3d 1373, 1383 (Fed. Cir. 2011).

### 1.   The '809 Patent

IPT contends that the '809 patent discloses every limitation contained in Claim 1 of the '567 patent.  Docket No. 167 at 9.  The '809 patent discloses "an apparatus for producing fountain displays which include moving variable-play fountain sprays and comprises one or more nozzles with dual entry or multi-entry ports which are mounted on one or more moveable floats and are connectable to a source of pressurized liquid through a control apparatus which includes an alternating valve and valve system for producing oscillating, stationary and intermittent nozzle dispersal streams."  '809 patent (abstract) (filed October 27, 1997) [Docket No. 167-1].

Relying on its expert witness, Ronald Milner, IPT claims that the pump disclosed in the '809 patent is a battery-powered pump as disclosed in the '567 patent.  *See* Docket No. 167-4 at 30 ("it is well known to make a pump for toys battery powered"); Docket No. 167-11 at 4, ¶ 8.  The Court disagrees.

The '809 patent does not indicate how the pump is powered.  The specification for the '809 patent states that its preferred use is for fountain displays in locations such as "lobbies and malls to outdoor water shows at theme parks."  '809 patent col. 14 ll. 36-38.  Given such contemplated use, it is unlikely the pump is battery-operated.

Rather, the Court finds that the pump for the '809 patent likely uses AC power from an external source.  Thus, the '809 patent does not disclose "an at least partially submersible battery-powered fluid pump," as described in Claim 1 of the '567 patent.

IPT argues that the "tubular sleeves" or "figures" that are "fitted" to the "exit apertures" in the '809 patent anticipate the "character removably mounted over the at least one spout" limitation in Claim 1 of the '567 patent.  Docket No. 167 at 9; '809 patent col. 8 ll. 63-64 ("a plurality of open-ended flexible tubular sleeves 88 are fitted to the exit apertures").  As noted above, the '567 patent defines characters as "any representation of an animate or inanimate object or a portion thereof that is in some manner set apart from its surroundings."  '567 patent col. 3 l. 66 - col. 4 l. 2.  Claim 1 states that the invention includes "at least one character removably mounted over the at least one spout."  '567 patent col. 10 ll. 49-51.  The displays disclosed in the '809 patent are not disclosed as being "removably mounted" or, as construed by the Court, "securely held" and "interchangeable with another character" over an "exit aperture"; rather, they are mounted or fitted on top of the "tubular sleeves" in some undisclosed manner.  While the nature of the invention with its different variations of fountain displays suggests that the tubular sleeves are removable, the '809 patent does not describe this feature at all and thus fails to describe the "removably mounted" limitation in the '567 patent "with sufficient clarity and detail" that a person of ordinary skill in the field would recognize the existence of the patent feature in the reference.  *Crown Operations*, 289 F.3d at 1375.  As such, the '809 patent does not describe a "character removably mounted" over at least one "spout."

Because the '809 patent does not describe "an at least partially submersible

battery-powered fluid pump," and "at least one character that is securely held over at least one spout and which is interchangeable with another character," the Court finds that the '809 patent does not disclose every element contained in Claim 1 of the '567 patent.  Neither side argues that summary judgment on this prior art reference is precluded by a genuine dispute of material fact, nor does the Court perceive one. Accordingly, IPT has failed to show by clear and convincing evidence that the '809 patent anticipates Claim 1 of the '567 patent.  *See Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1265 (Fed. Cir. 2012) ("To show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention.") (citation omitted).

### 2.   *The '170 Application*

The '170 application describes "a combined water scenery toy, which uses water as its medium and belongs to children toys.  The utility model is composed of a micro water pump, a water path connecting plate which is provided with a connecting hole, a water cover, a plurality of connecting pieces, a water receiving disk which is provided with a water storage pond and a base seat."  '170 application (abstract) (published December 1, 1999) [Docket No. 167-2].

Relying on Mr. Milner's expert report, IPT argues that the '170 application describes and teaches every element in Claim 1 of the '567 patent.  Docket No. 167-11 at 6, ¶ 13.  However, the '170 patent does not disclose a "partially submersible battery-powered fluid pump."  '567 patent col. 10 ll. 45-46.  The specification of the '170 application describes a "water pump with an electric motor," but does not describe whether this pump is submersible and also does not disclose whether the source of the

23

electricity is a battery.  Docket No. 167-2 at 5.

Mr. Milner's expert report makes the conclusory statement that the electric motor is "certainly battery powered since it is a children's toy."  Docket No. 167-4 at 26.  In his supplemental expert report, Mr. Milner acknowledges that the '170 application is used primarily for "table top use" and is not used in a pool or other body of water.  Docket No. 209-1 at 10, ¶ 21.  Nevertheless, Mr. Milner argues that the "submersible" battery-powered pump disclosed in the '567 patent is a "minor" difference because having an external pump is a "trivial modification."  *Id*. ¶ 23.  As noted in the notice of allowance for the '567 patent, one distinguishing feature of the '567 patent from United States Patent No. 4,951,329 (the "'329 patent") is the fact that the '567 patent is "either free stand[ing] in a tub/pool or the battery-powered pump is submerged in the water."  Docket No. 191-9 at 2.  Thus, Mr. Milner's assertion that this distinction is "trivial" is unpersuasive.

Anticipation "requires the presence in a single prior art disclosure of all elements of a claimed invention *arranged as in the claim*."  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1334-35 (Fed. Cir. 2008) (emphasis in original; citation omitted).  Because the pump disclosed in the '170 application is not submersible as described in the '567 patent, the '170 application does not disclose every element contained in the '567 patent.  Docket No. 209-1 at 10, at ¶¶ 23-24.  Neither side identifies any factual dispute as to the '170 application.  Accordingly, the Court finds that IPT does not provide clear and convincing evidence that the '170 application anticipates Claim 1 of the '567 patent.  *Karsten Mfg. Corp.*, 242 F.3d at 1383.

### 3.   The '505 Application

IPT argues that the '505 application anticipates every element disclosed in Claim

1 of the '567 patent.  Docket No. 167 at 10.  The '505 application describes "a water

spraying toy; which, at the bottom of its casing is provided with an inlet and at the top is

provided with a nozzle, wherein the said inlet is connected with the said nozzle with the

flowing water cavity provided inside the said casing; the inside of the said flowing water

cavity located at the inlet is provided with moving water blades which can be immersed

into water and the inside of said casing is also provided with a motor driving the said

moving water blades to rotate, with batteries supplying power for the said motor and a

power switch."  '505 application (abstract) (published January 1, 2003) [Docket No.

167-3 at 2].

Plaintiff argues that the '505 application fails to disclose at least three limitations

of the '567 patent.  First, plaintiff claims that the '505 application does not disclose a

"character," which is defined in the '567 patent as "any representation of an animate or

inanimate object or a portion thereof."  Docket No. 191 at 9.  Plaintiff states that the

nozzles of the '505 application are not representations of anything and therefore do not

anticipate the "character" feature in Claim 1 of the '567 patent.  *Id*.  Defendant relies on

Mr. Milner's declaration, wherein Mr. Milner argues that the '505 application discloses

"geometrical shapes, akin to the embodiments described in the '567 patent as 'a

scholastic shape theme with characters representing various shapes.'"  Docket No.

209-1 at 13-14, ¶ 31 (citing '567 patent col. 4 ll. 24-25).  The Court disagrees.

Based on the figures and the specification of the '505 application, the five

nozzles disclosed therein are all circular and only the exit holes (or outlets) on top of the

25

nozzles represent different configurations.  Docket No. 167-3 at 11 (Fig. 6).  These nozzles are not representations of animate or inanimate objects, much less a "scholastic shape theme with characters representing various shapes."  '567 patent col. 4 ll. 24-25.  As such, the Court agrees with plaintiff that the '505 application does not disclose a "character" as defined in Claim 1 of the '567 patent.

Plaintiff next argues that the '505 application does not disclose "at least one character removably mounted over the at least one spout."  '567 patent col. 10 ll. 49-51. Plaintiff reads the '505 application to describe the invention's nozzles as not being removable.  As construed by the Court, "removably" means "interchangeable with another character."  In the '505 application, one embodiment contains a disk with a variety of nozzles that can be rotated over the water source, thus causing different spray patterns.  *See* Docket No. 167-3 at 7.  Although plaintiff may be correct that the disk does not appear to be removable, the different nozzles are interchangeable and therefore meet the definition of being "removable" (although, as indicated above, a "character" is not disclosed in the '505 application).

Finally, plaintiff argues that the '505 application does not disclose a "themed amusement assembly."  Docket No. 191 at 10.  The plaintiff cites to those portions of the patent that identify examples of themes, such as a jungle theme (with characters of African animals), an aquatic theme (with characters of sea creatures), a dinosaur theme, and a circus theme.  *Id.*  Defendant does not rebut this distinction, *see* Docket No. 209 at 9, although Mr. Milner argues that the spray patterns created by the invention described in the '505 application is a "themed characteristic" that "can be considered a theme."  Docket No. 209-1 at 13-14.  However, the theme in the '567

26

patent is created by the faceplate assembly, not the water flowing from it.  Thus, because the '505 application does not disclose a "themed amusement assembly" or a "character" and because neither side identifies a genuine issue of material fact as to these issues, the Court finds that IPT does not provide clear and convincing evidence that the '505 application anticipates Claim 1 of the '567 patent. *Karsten Mfg. Corp.*, 242 F.3d at 1383.

IPT has not shown through clear and convincing evidence that the '809 patent, the '170 application, or the '505 application anticipate Claim 1 of the '567 patent. Accordingly, the Court finds that IPT is not entitled to summary judgment on its counterclaim for anticipation.

### B.  Obviousness

IPT argues that Claims 1, 13, and 17 of the '567 patent are invalid as obvious under 35 U.S.C. § 103.  Docket No. 167 at 11.  Specifically, IPT argues that it would have been obvious to a person of ordinary skill in the art to combine the United Kingdom Patent Application 2,023,435 (the "'435 application") [Docket No. 48-3], United States Patent No. 4,021,150 (the "'150 patent") [Docket No. 191-11], the '809 patent, the '170 application, the '505 application, United States Patent No. D282,563 (the "'563 patent") [Docket No. 191-3], United States Patent No. 5,337,956 (the "'956 patent") [Docket No. 191-4], United States Patent No. 4,951,329 (the "'329 patent") [Docket No. 191-10], and United States Patent No. 4,591,094 (the "'094 patent") [Docket No. 191-5] to create the elements contained in Claims 1, 13, and 17 of the '567 patent.[8]  Docket

---

[8]Under § 103, the relevant content for an obviousness analysis is what was in the prior art "at the time the invention was made."  35 U.S.C. § 103(a).  All the

27

No. 167 at 11; Docket No. 167-4 at 34-39.

Under 35 U.S.C. § 103(a), a patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  To avoid being obvious, a patent must be "more than the predictable use of prior art elements according to their established functions."  *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007).  To determine obviousness, "the invention must be considered as a whole and the claims must be considered in their entirety."  *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1479-80 (Fed. Cir. 1998).

Although the ultimate determination of obviousness under § 103 is a question of law, it is based on several underlying factual findings, including (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claimed invention and the prior art; and (4) the evidence of secondary factors such as commercial success, long-felt need, and failure of others.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1310 (Fed. Cir. 2011).  Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate."  *KSR*, 550 U.S. at 427.

Because patents are presumed valid, 35 U.S.C. § 282, a moving party seeking to

---

aforementioned prior art predates the November 3, 2003 invention date of the '567 patent.

invalidate a patent at summary judgment must submit clear and convincing evidence of facts underlying the issue of invalidity from which no reasonable juror could conclude otherwise.  *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2246 (2011).

### 1.   Level of Ordinary Skill in the Art

The "issue of obviousness is determined entirely with reference to a hypothetical 'person having ordinary skill in the art.'" *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985).  Thus, it is only that hypothetical person who is presumed to be aware of all the pertinent prior art and the actual inventor's skill is irrelevant to the inquiry.  *Id*.  A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights.  *Id*.

As noted above, a person of ordinary skill in the art for purposes of this case is one who would have experience in designing toys, having at least a rudimentary knowledge of mechanical and battery-powered components used for the design of toys. Thus, for IPT to prevail on its motion, it must show that, because of a teaching, suggestion, or motivation in the prior art, a person with a rudimentary knowledge of mechanical and battery-powered components used in toys would have combined or modified the prior art in the manner identified in Claims 1, 13, and 17 of the '567 patent. *KSR*, 550 U.S. at 418-19.

### 2.   Scope of the Prior Art

The term prior art refers to "knowledge that is available, including what would

be obvious from it, at a given time, to a person of ordinary skill in an art."

*Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1453 (Fed. Cir. 1984).  In

order to determine the scope of the prior art, the Court must first determine two things:

(1) what was the purpose sought to be accomplished by the inventors of the '567

patent; and (2) what constitutes analogous art in light of this purpose.

The '567 patent notes that there are many bath and pool toys on the market, but

not many of them spray streams of water.  '567 patent col. 1 ll. 16-19.  The problem

with the existing spray bath and pool toys, according to the '567 patent, is the means by

which the water flows through the toys.  *Id.* at ll. 20-28.  Ones using water from a faucet

waste water and cause potential safety concerns in bathtubs by filling the tubs too high

for particular infants.  *Id.* at ll. 28-33.  Ones using gravity require a parent or child to lift

water to a water reserve from which the water flows to the toy and thereby may detract

from the enjoyment of the toy.  *Id.* at ll. 33-37.  Similarly, toys relying upon a manual

pump require the users to exert the effort necessary to operate the pump, which may

detract from the users' enjoyment.  *Id.* at ll. 37-41.  The '567 patent notes that, while

"AC-powered" pumps could provide the necessary water flow to a fountain toy, such

electrical current would pose a danger of injury to any user.  The '567 patent provides

the solution to this problem through the use of a battery-operated pump that is at least

partially submersible and which operates at a power level that does not pose a safety

risk to the user.  *Id.* at ll. 65-66; col. 8 ll. 3-17.  The '567 patent states that "no bathtub

toys are known that utilize DC-powered pumps."  *Id.* col. 1 ll. 56-57.  Based on this

purpose, the Court next determines what prior art would be analogous.

To qualify as analogous art, the reference must (1) be from the same field of endeavor; or (2) must be reasonably pertinent to the particular problem with which the inventor is involved.  *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1321 (Fed. Cir. 2011).  To determine whether a reference is in an inventor's field of endeavor, courts consult "the structure and function of the claimed invention as perceived by one of ordinary skill in the art" with "reference to explanations of the invention's subject matter in the patent application."  *In re Bigio*, 381 F.3d 1320, 1325-26 (Fed. Cir. 2004). Additionally, a reference is reasonably pertinent if it, as a result of its subject matter, "logically would have commended itself to an inventor's attention in considering his problem."  *Innovention*, 637 F.3d at 1321.  If a reference has the same purpose as the claimed invention, an inventor may well have been motivated to consider the reference when making his invention.  *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992).  However, if prior art is directed towards a different purpose, an inventor would accordingly have had less motivation or occasion to consider it.  *Id*.

In this case, there is no dispute that the '809 patent, the '505 application, the '435 application, the '150 patent, and the '329 patent qualify as analogous art.  *See* Docket No. 215-1 at 7-13.  However, Two Moms argues that the '170 application, the '563 patent, the '956 patent, and the '094 patent are not analogous because these were not reasonably pertinent to the problem addressed by the inventors of the '567 patent.

*Id*. at 8.   The Court agrees with Two Moms that the '563 patent,[9] the '956 patent,[10] and the '094 patent[11] are not analogous, but disagrees with respect to the '170 application. *See Innovention*, 637 F.3d at 1321 (finding a reference analogous if it logically would have commended itself to an inventor's attention in considering his problem).

The '170 application describes its function as a "combined water scenery toy, which uses water as its medium and belongs to children toys."  Docket No. 167-2 at 2 (abstract).  The '567 patent describes its "[f]ield of the [i]nvention" as relating to "water toys, and more particularly, a water toy incorporating a pump-activated fountain."  '567 patent col. 1 ll. 6-7.  As such, the inventions perform essentially the same function: spraying water in a manner that is entertaining for children by utilizing electric water pumps.

The '170 application defines its structure as including a "micro water pump," "connecting pieces," and a "water path connecting plate which is provided with a connecting hole."  Docket No. 167-2 at 4.  The '567 patent describes its structures as including, among other things, "an at least partially submersible pump that is fluidly

---

[9]The '563 patent does not identify a purpose and, from the face of the patent, its intended use is unclear.  Moreover, it is also unclear why a person of ordinary skill in the art would have considered this patent in reference to the invention disclosed in the '567 patent.

[10]The '956 patent is not pertinent to the problem faced by the inventors of the '567 patent because it is directed towards a different purpose, namely, attaching toys to drinking faucets.  The '956 patent also does not address the problems associated with rising water levels in a bathtub or pool.

[11]Although the '094 describes a closed-circuit fountain apparatus that can be used in a pool or shallow pond, '904 patent col. 3 ll. 15-18, it does not describe an electric power source, which is a key feature of the '567 patent.

coupled with a fountain amusement assembly" and "characters heads or other fanciful representations." '567 patent (abstract).  As such, both references rely on similar structures: electric water pumps, pieces or characters, and a device to carry water from the pump to an outlet.  Because the '170 application and the '567 patent have similar functions and structures, the Court finds that the '170 application belongs to the same field of endeavor as the '567 patent.  *See, e.g., In re Paulsen*, 30 F.3d 1475, 1481-82 (Fed. Cir. 1994) (finding that hinges, latches, and springs for piano lids, furniture cabinets, and audio cassette holders were relevant prior art for patentee's hinge and latch mechanism for connecting laptop computer's screen to rest of computer).

Additionally, the '170 application qualifies as analogous art because it is reasonably pertinent to the problem the inventors of the '567 patent addressed. Although Two Moms argues that the '170 application is not analogous because it describes a table top feature, Docket No. 215-1 at 7, the Court finds that Two Moms unduly limits the relevant universe of "water toys."  *See KSR*, 550 U.S. at 420 (*"The second error of the Court of Appeals lay in its assumption that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem."*).  The '170 application describes a "water scenery toy" and states that the invention "belongs to children toys."  Docket No. 167-2 at 2.  A person of ordinary skill attempting to create a water fountain that uses a battery-powered pump and includes a dynamic water display would look to the teachings of the '170 application for guidance.  Accordingly, the Court finds that the '170 application qualifies as analogous prior art.  *See* Docket No. 167-2 at 4 ("The present utility model aims at providing a combined water scenery toy, such as fountain toys").

In sum, the Court finds that the analogous prior art for purposes of an obviousness determination includes the '435 application, the '150 patent, the '809 patent, the '170 application, the '505 application, and the '329 patent.

### 3. Differences Between the Prior Art and the Claims at Issue

Two Moms argues that all of the elements disclosed in the '567 patent were not independently known in the prior art before November 3, 2003.  Specifically, Two Moms argues that the prior art does not disclose all of the elements contained in Claims 1, 13, and 17 of the '567 patent.  Docket No. 191 at 12.

### a. Claim 1 of the '567 Patent

As noted above, Claim 1 of the '567 patent discloses four elements: (1) an at least partially submersible battery-powered fluid pump; (2) a themed amusement assembly, the assembly including at least one spout out of which water streams when the toy is in operation; (3) at least one character that is securely held over at least one spout and which is interchangeable with another character, wherein water appears to stream from the character when the toy is in operation; and (4) a fluid conduit connecting the fluid pump and the assembly.  '567 patent col. 10 ll. 45-54.

Two Moms argues that the Court should not reconsider the submersible pump referred to in the first element because, during the prosecution of the '567 patent, the PTO considered United States Patent No. 4,607,400 (the "'400 patent"), which discloses a battery-driven submersible pump.  Docket No. 215-1 at 12.  Although the bilge pump described in the '400 patent is a "simple-battery driven submersible bilge pump," '400 patent col. 2 ll. 5-7, the battery that powers the bilge pump in the '400 patent is not submersible.  Instead, "[a]n insulated wire 42 is attached to the

34

[submersible bilge] pump and is carried outside of the tub to be attached to the portable battery located there." '400 patent col. 2 ll. 49-51.  As such, the '400 patent does not disclose the same "submersible battery-powered fluid pump" found in Claim 1 of the '567 patent.  By contrast, both battery-powered motors described in the '505 application and the '150 patent are submersible.  *See* Docket No. 167-3 at 3 ('505 application Claim 1: "inside of the said flowing water cavity . . . immersed into water . . . with a motor driving the said moving water blades to rotate, with batteries supplying power"); '150 patent (Fig. 9); *id*. col. 5 ll. 13-16 ("an aquatic toy-model using [battery operated pump], which is one of the applications of this invention taking advantage of a feature of the pump that it can be operated submerged in fluid.").[12]  Thus, although the '567 patent states that "no bathtub toys are known that utilize DC-powered pumps," '567 patent col. 1 ll. 56-57, there were at least two water toys that did use DC-powered pumps in the prior art at the time of the issuance of the '567 patent, which the PTO did not consider.

With respect to the second and third elements of Claim 1 of the '567 patent, consisting generally of the themed amusement assembly and an interchangeable character, the '170 application describes that the "connecting pieces," through which water flows, may have "various shapes" such as "bird, fish, conch, bamboo, [and a] human body."  Docket No. 167-2 at 5.  Although the '170 application does not describe how the "connecting pieces" are attached to the "connecting hole," the Court finds that it

---

[12]*See also* '435 application col. 2 ll. 85-88 ("A toy boat, having a motor driven pump, which draws in water through an intake orifice located below the waterline and feeds it to spray jets located on the deck").

would have been obvious to a person of ordinary skill in the art to create the snapable mounts disclosed in the '567 patent based on this prior art. *See KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Based on the foregoing, the Court finds that the '170 application discloses the second and third elements as those are described in Claim 1 of the '567 patent.

The '435 application and the '170 application also disclose the fourth element: "a fluid conduit connecting the fluid pump and the assembly." *See* '435 application col. 1 ll. 57-60 ("In the lower part 1 there is provided a suction pump 3 which draws in the water through the intake orifice 4 which is directed roughly vertically downwards, and feeds the water, via a hose 5, to the spray nozzles 6 on the deck").

Given this evidence, the Court finds that a combination of the '150 patent, the '505 application, the '435 application, and the '170 application disclose the four elements described in Claim 1 of the '567 patent and that a person of ordinary skill in the art attempting to create a fountain toy that safely uses a battery-powered pump would have read the elements of the '170 application, the '505 application, the '435 application, and the '150 patent in the same way they are disclosed in the '567 patent.

### b.   Claim 13 of the '567 Patent

Claim 13 of the '567 patent discloses four elements: (1) a battery-operated pump; (2) a themed faceplate assembly separate from the pump, the faceplate assembly including a faceplate, one or more fluid passages terminating in an outlet, where a portion of the faceplate directly above or around the outlet is configured to resemble a removable character or one integrally molded, (3) one or more connectors

adapted to reasonably secure the faceplate assembly to a generally vertical surface; and (4) tubing fluidly connecting the faceplate assembly and the pump.  '567 Patent col. 14 ll. 25-35.  As discussed above, the first and fourth elements are disclosed in the prior art.  Thus, the discussion will focus on the second and third elements.

Two Moms argues that the second and third elements of Claim 13, unlike the second and third elements of Claim 1, disclose a generally vertically disposed themed assembly that is removably secured to a vertical surface such as a bathtub wall. Docket No. 191 at 12.  Two Moms claims that none of the prior art discloses elements "secured to a vertical surface."  *Id*.  Given the Court's claim construction, Two Moms is correct that one difference between Claim 1 and Claim 13 is that the "themed assembly" is vertical in Claim 13, while it is of unspecified orientation in Claim 1. However, the Court finds that the orientation of a themed assembly is insufficient to render the element nonobvious.  It would have been obvious to a person of skill in the art that it is possible to change the orientation of a themed assembly from a horizontal position to a vertical position.  *See KSR*, 550 U.S. at 417 (noting that to avoid being obvious, a patent must be "more than the predictable use of prior art elements according to their established functions."); *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1243 (Fed. Cir. 2010) (finding the difference between a vertical hitch arrangement and a horizontal hitch arrangement insufficient to render a claim nonobvious).  Here, shifting the assembly from a horizontal to a vertical position "simply arranges old elements with each performing the same function it had been known to perform" and this yields nothing more than one would expect from such an arrangement.  *KSR*, 550 U.S. at 417; *see id*. at 421 (noting that, most inventions that are obvious were also obvious to try

and a combination is only obvious to try if "a person of ordinary skill has a good reason to pursue the known options").

In addition, the second and third elements are obvious because the use of "suction cups" to attach toys to horizontal surfaces had been disclosed in the '150 patent, *id*. col. 5 ll. 18-19, and the vertical movement of water through the use of a submersible battery-powered pump was disclosed in the '505 application.  Docket No. 167-3 at 3.  It would have been obvious to a person of ordinary skill in the art to combine the teachings of the suction cup with the vertical movement of water to arrange a vertical assembly.

Given this evidence, the Court finds that a combination of the '505 application, the '150 patent, and the '170 application discloses the four elements described in Claim 13 of the '567 patent.  *See In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000).

### c.  Claim 17 of the '567 Patent

Claim 17 of the '567 patent discloses five elements: (1) an at least partially submersible battery-operated pump, the pump including one or more suction cups adapted to removably secure the pump to a surface; (2) a faceplate assembly, the faceplate assembly including a faceplate, at least one spout out of which water streams when the toy is in operation; (3) at least one character that is securely held over at least one spout and which is interchangeable with another character, wherein water appears to stream from the character when the toy is in operation; (4) one or more suction cups adapted to removably secure the faceplate assembly to a generally vertical surface; and (5) tubing fluidly coupling the faceplate assembly and the pump.  '567 patent col. 12 ll. 9-23.  Claim 17 is a combination of elements from Claim 1 and Claim 13 and

otherwise does not disclose new elements.  Given that the Court has found that the prior art contains the elements described in Claims 1 and 13, it follows that the elements in Claim 17 are also found in the prior art.

Based on the foregoing, the Court finds that all of the elements contained in Claims 1, 13, and 17 of the '567 patent were independently known in the prior art before November 3, 2003.  However, this does not end the inquiry.  The mere fact that prior art references could be combined to reach the patented design does not render the resultant combination obvious absent a reason to combine the references in such a manner.  *In re Mills*, 916 F.2d 680, 682 (Fed. Cir. 1990).  Obviousness requires the additional showing that a person of ordinary skill, at the time of the invention, would have selected and combined the prior art elements in the normal course of research and development to yield the claimed invention.  *KSR*, 550 U.S. at 421.

### 4.  *Motivation to Combine*

Identifying a motivation to combine references serves to prevent hindsight bias. *See McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001) ("To prevent hindsight invalidation of patent claims, the law requires some 'teaching, suggestion or reason' to combine cited references.") (citation omitted).  The Federal Circuit previously held that the reason, suggestion, or motivation to combine could be found explicitly or implicitly: "1) in the prior art references themselves; 2) in the knowledge of those of ordinary skill in the art that certain references, or disclosures in those references, are of special interest or importance in the field; or 3) from the nature of the problem to be solved." *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324,

1329 (Fed. Cir. 2009). *KSR* expanded the sources of information for a properly flexible obviousness inquiry to include market forces; design incentives; the "interrelated teachings of multiple patents"; "any need or problem known in the field of endeavor at the time of invention and addressed by the patent"; and the background knowledge, creativity, and common sense of the person of ordinary skill. 550 U.S. at 418-21.  In *KSR*, the Supreme Court eschewed rigid rules that denied factfinders recourse to common sense and logic. *Id.* at 421; *Wyers*, 616 F.3d at 1240 ("Thus, in appropriate cases, the ultimate inference as to the existence of a motivation to combine references may boil down to a question of 'common sense,' appropriate for resolution on summary judgment").  Thus, the Court must decide, without the benefit of hindsight, if it would have been obvious to a person of ordinary skill to combine the elements from the prior art in the way the inventors of the '567 patent did.

The Court finds that, based on the interrelated teachings of the prior art, one with ordinary skill in the art would have been motivated to combine the elements in the prior art in the manner that the inventors of the '567 patent did.  As recognized in the '567 patent and as suggested by common sense, there is market demand for children's water toys.  The prior art also teaches that children are entertained by toys that spray water, *see* '170 application, Docket No. 167-2 at 4 (water scenery toy); '435 application, Docket No. 48-3 at 2 (toy boat with spray jets); '505 application, Docket No. 167-3 (water spraying toy), and toys that emit water from representations of plants or animals. *See* '170 application, Docket No. 167-2 at 5 ("bird, fish, conch, elephant, bamboo"). Based on this demand, a person of ordinary skill in the art would have been motivated

to create a children's water toy combining these elements.  *See KSR*, 550 U.S. at 417

("When a work is available in one field of endeavor, design incentives and other market

forces can prompt variations of it, either in the same field or a different one"); *Wyers*,

616 F.3d at 1243 (noting an inventor's motivation can be based on expected success).

Specifically in relation to the purpose of the invention discussed in the '567

patent, '567 patent col. 1 ll. 56-57, the Court finds that it would have been obvious to a

skilled person in the art to use a water pump similar to the one disclosed in the '150

patent and the '505 application.  In addition, it would have been obvious to a person

skilled in the art to use DC battery power as an alternative to AC power because the

prior art teaches that the low voltage used in many DC batteries is appropriate for

submersible motors in children's water toys.  *See* '150 patent col. 5 ll. 13-16 (aquatic

toy "taking advantage of a feature of the pump that it can be operated submerged in

fluid").  Moreover, it would have been obvious to a person of ordinary skill in the art to

combine the teachings of the submersible battery operated pump disclosed in the '150

patent, col. 5 ll. 25-28 ("in Fig. 1, fluid will be sucked in through the admission port 4a

and, via the discharge port 3a, will be discharged from the jet nozzle"), with the

streaming features of the '505 application, Docket No. 167-3 at 5 ("the water is sucked

automatically from the inlet and sprayed from the nozzles to produce various water

spraying effects"), to create a constant upward stream of water and avoid the need for

manual refilling.  Similarly, it would have been obvious to a person of ordinary skill in

the art to combine the streaming features of the '505 application with the

interchangeable pieces disclosed in the '170 application to maintain the interest of small

children.  Docket No. 167-2 at 5 ("the present utility model has many combination

changes, helping develop children's intelligence").  In the typical case, the more elements that would need to be combined argues against the existence of a motive to combine all of them; however, here there is a finite number of solutions to these straightforward issues.  "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense."  *KSR*, 550 U.S. at 421.

Based on the foregoing, the Court finds that IPT has established a prima facie case of obviousness because it would have been obvious to a person of ordinary skill, motivated to create a children's water toy that sprayed water and was safe and appropriate for use in a bathtub, to combine the elements in the prior art in the manner performed by the inventors of the '567 patent.  *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010). Next, the Court will consider objective indicia of nonobviousness.  *Id*. (noting that, once a defendant has made a prima facie case of obviousness, the Court must determine whether plaintiff's secondary objective evidence of nonobviousness – commercial success, long felt but unsolved needs, failure of others – is sufficient to overcome defendant's prima facie showing).

### 5.   *Secondary Considerations of Nonobviousness*

Before a court can make a finding of obviousness, and thereby hold a patent invalid, a court must determine whether there are any "secondary considerations" that

support a finding of nonobviousness.  *KSR*, 550 U.S. at 405.  This is because

secondary considerations "may often establish that an invention appearing to have

been obvious in light of the prior art was not."  *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1310

(Fed. Cir. 2010) (citation omitted).  Further, secondary considerations "can be the most

probative evidence of non-obviousness in the record, and enables the . . . court to avert

the trap of hindsight."  *Id*.  Secondary considerations relevant to an obviousness

determination include: commercial success; skepticism in the field; copying by others;

meeting a long felt, but unsolved need; and failure by others.  *See, e.g., KSR*, 550 U.S.

at 405 (commercial success and long felt need); *Akamai Techs., Inc. v. Cable &*

*Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1196 (Fed. Cir. 2003) (copying);

*Transocean*, 617 F.3d at 1304 (affirming non-obviousness based on commercial

success, copying by others).

Two Moms argues that it has provided sufficient evidence of commercial success

and copying to rebut a prima facie case of obviousness.  Docket No. 191 at 15.  To

show objective evidence of commercial success, Two Moms relies on the marketability

of the Yookidoo toys and the sales figures these toys generated.  *Id*.  In addition, Two

Moms asserts that the "play value" of the Yookidoo toys establishes a nexus between

the elements contained in the '567 patent and the commercial success of the Yookidoo

toys.  *Id*. at 16.  In response, IPT argues, first, that Two Moms does not show a nexus

between the commercial success of the Yookidoo toys and the '567 patent, Docket No.

209 at 11; and, second, that Two Moms does not provide evidence of copying on the

part of IPT.  *Id*. at 12.

### a.  Commercial Success

Plaintiff argues that the commercial success of the accused Yookidoo toys is based on children's ability to remove and replace "the tumblers and boats (characters) from their mounted position over the fountain spouts."  Docket No. 191 at 17.  In support of this argument, plaintiff provides links to videos of children playing with the Yookidoo toys, Docket No. 191 at 16 n. 1-4, as well as customer reviews from the internet discussing how much children enjoy the Yookidoo toys.  Docket No. 191-14. Based on this evidence, plaintiff claims that it has established a nexus between the commercial success of the accused Yookidoo toys and the '567 patent.  Plaintiff asserts that the Yookidoo toys utilize every element contained in Claim 1 of the '567 patent including "at least one character removably mounted over the at least one spout," '567 patent col. 10 ll. 49-51, "an at least partially submersible battery-powered fluid pump," *id*. col. 10 ll. 45-46, and "a fluid conduit connecting the fluid pump and the amusement assembly."  *Id*. col. 10 ll. 53-54; Docket No. 215-1 at 13.

In order to show secondary evidence of nonobviousness, a patentee must establish a nexus between commercial success of the accused products and the patented invention.  *See In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *In re GPAC, Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("For objective [evidence of secondary considerations] to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention").  To establish a nexus, plaintiff here must present proof that the sales of the Yookidoo products were a "direct result of the unique characteristics of the ['567 patent] – as opposed to other economic

and commercial factors unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d at 140; *In re Huai-Hung Kao*, 639 F.3d 1057, 1069 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists"); *see also Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983) (holding that a claimed invention is obvious when the patent holder "failed to show that such commercial success . . . was due to anything disclosed in the patent in suit which was not readily available in the prior art").  Where commercial success results from something other than what is novel in the claim, there is no nexus to the merits of the claimed invention.  *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

The Court finds that Two Moms has not established a nexus between the commercial success of the Yookidoo toys and the '567 patent.  Two Moms' argument relies on the fact that the Yookidoo toys utilize one element in Claim 1 of the '567 patent, namely, a character removably mounted over a spout.  Docket No. 191 at 18. During claim construction, the Court rejected Two Moms' proposed construction of the term "at least one character removably mounted over the at least one spout" as including a character "removable by a user playing with the toy."  Instead, the Court construed the term as "at least one character that is securely held over at least one spout and which is interchangeable with another character."  As noted above, without

the limitation of a character "removable by a user playing with the toy," Claim 1 of the '567 patent is not novel and does not reveal a new feature distinguishable from the prior art because the '170 application discloses interchangeable "pieces" or "characters" over a spout.  *See Ormco*, 463 F.3d at 1313 (finding that, if the feature that creates the commercial success was known in the prior art, the commercial success is not pertinent).  Because the removably mounted character element was previously disclosed in the prior art, Claim 1 of the '567 patent cannot establish a nexus with the Yookidoo toys.  *See Tokai*, 632 F.3d at 1369; *Ormco*, 463 F.3d at 1312.  Similarly, Two Moms cannot establish a nexus between the commercial success of the Yookidoo toys and the other elements in Claim 1 of the '567 patent because all the other elements are also disclosed in combinations of the '150 patent, the '170 application, and the '505 application.  *See In re Huai-Hung Kao*, 639 F.3d at 1070 (finding that, to establish commercial success, plaintiff must show that "the embodying product resulted from the merits of the claimed invention as opposed to the prior art"); *J.T. Eaton & Co., Inc. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) (finding commercial success where "the commercial success of its product derives from the claimed invention and is attributable to something disclosed in the patent that was not readily available in the prior art").

Two Moms also fails to provide sufficient evidence that the Yookidoo toys were a commercial success.  To show commercial success, Two Moms relies on the Yookidoo toys' first place finish at an International Toy Fair.  *See* Docket No. 66-4.  Plaintiff presents deposition testimony from Michael Varda, president of IPT, testifying that the

Yookidoo toys had a large number of sales, Docket No. 183 at 6 (Varda Dep. 57:25-58:11), and it also provides evidence that, for the three years IPT sold the Yookidoo toys, its profit margins increased and it generated $2 million in additional revenue. Docket No. 191-12 at 19.

Generally, to establish commercial success, a plaintiff must provide evidence that the sales of the product represent a "substantial quantity in th[e] market." *In re Huang*, 100 F.3d at 140. A plaintiff can also establish commercial success by presenting evidence of market share, growth in the market share, or that the accused products replaced earlier products sold by others. *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1150-51 (Fed. Cir. 1983).

The Court finds that the testimony of Mr. Varda as well as IPT's $2 million in additional revenue is insufficient to show that the Yookidoo toys were a commercial success. Although the Yookidoo toys were profitable, Two Moms' evidence does not establish that the sales of the Yookidoo toys were of a substantial quantity in the market. Two Moms also fails to provide evidence of IPT's market share, explain whether IPT's market share grew as a result of selling the Yookidoo toys, or show that the Yookidoo toys replaced other toys in the market. *In re Applied Materials Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012) ("the number of units sold without evidence of the market share is only weak evidence of commercial success") (citation omitted); *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991) ("[I]nformation solely on numbers of units sold is insufficient to establish commercial success."). Moreover, Two Moms' evidence that the Yookidoo toys won an international competition does not

present evidence of an increase in market share.  *Cf. Pfizer, Inc. v. Teva Pharms. USA, Inc.*, --- F. Supp. 2d ----, 2012 WL 2951367, at *20 (D. Del. July 19, 2012) (finding that plaintiffs' evidence was sufficient to demonstrate commercial success because they showed that accused product "share[d] the market with many competing products as well as with low-cost generic gabapentin alternatives, yet maintain[ed] considerable net sales and market shares").

Accordingly, the limited evidence provided by Two Moms is insufficient to overcome IPT's prima facie showing of obviousness both because it fails to establish a nexus between the '567 patent and the Yookidoo toys and because it fails to show that the Yookidoo toys were a commercial success.  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007) ("Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion."); *see also Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed. Cir. 1985) (holding on summary judgment that, even though commercial success could be deduced, it deserved no weight because a nexus was not established), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999) (en banc); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (affirming the district court's finding of obviousness although the "district court explicitly stated in its opinion that Leapfrog had provided substantial evidence of commercial success, praise, and long-felt need, but that, given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion that claim 25 would have been obvious").

48

### b.  Copying

Two Moms also argues that it can establish nonobviousness by showing that IPT copied the elements of the '567 patent.  Docket No. 191 at 17.  In support, Two Moms claims that IPT became aware of the '567 patent and "liked the concept so much that they decided to copy not just one of the embodiments of the '567 patent but both embodiments, which are also 'wall mounted' and 'floating.'"  *Id.*  Two Moms contends that "it is extremely hard to believe that a company would invest the thousands of dollars in molds and other equipment it takes to develop not just one but both accused products without first conducting a patent search."  Docket No. 66 at 26.  It asserts that the chances of developing "both a wall mounted and floating embodiment without knowledge of the '567 Patent seems highly unlikely and is submitted to not be a coincidence."  *Id.*  The Court disagrees.

Not every competing product that arguably falls within the scope of a patent is evidence of copying; otherwise, every infringement suit would automatically confirm the nonobviousness of the patent.  *Wyers*, 616 F.3d at 1246.  In order for plaintiff to establish copying, it must present evidence of efforts to "replicat[e] a specific product." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).  Efforts to replicate may be demonstrated through internal company documents, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a replica, or access to the patented product combined with substantial similarity to the patented product.  *Id.*; *Wyers*, 616 F.3d at 1246.

Two Moms has introduced no such evidence here.  Two Moms' arguments in this instance are mere conjecture and speculation and, as such, are insufficient to raise a triable issue of fact.  *See TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002) ("unsupported or conclusory averments are insufficient to avoid summary judgment where the moving party has met its initial burden") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Moreover, Two Moms acknowledges that it cannot introduce evidence of copying because "much of the evidence of commercial success of the invention is in . . . [Yookidoo's possession], an Israel partnership, that has not been served yet."  Docket No. 66 at 25.[13]  Accordingly, Two Moms fails to establish that IPT engaged in copying.  *See Iron Grip Barbell Co., Inc.*, 392 F.3d at 1325.

In sum, Two Moms' evidence of secondary considerations of nonobviousness is insufficient to overcome IPT's strong prima facie case of obviousness.  *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1371 (Fed. Cir. 2006) ("The presence of certain secondary considerations of nonobviousness are insufficient as a matter of law to overcome our conclusion that the evidence *only* supports a legal conclusion that claim 1 would have been obvious") (emphasis in original).  Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.

---

[13]Two Moms' argument with respect to the "patent pending" mark on the Yookidoo products, Docket No. 191 at 17; Docket No. 183 at 10 (Varda dep. 144:17-25), is similarly unavailing because IPT is not a manufacturer of the toys.

*KSR*, 550 U.S. at 427.  Because no genuine issue of material fact exists, the Court

finds that IPT has met its burden of demonstrating that the '567 patent is invalid as

obvious.  The Court therefore will grant IPT's motion for summary judgment.

## V.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion for Leave to File Sur-Reply to Defendant's

Reply in Support of Defendant's Supplemental Motion for Summary Judgment on its

Counterclaim for Invalidity of U.S. Patent No. 6,782,567 [Docket No. 215] is **GRANTED**.

It is further

**ORDERED** that Defendant's Supplement Motion for Summary Judgment on its

Counterclaim for Invalidity of U.S. Patent No. 6,782,567 [Docket No. 167] is **GRANTED**

in part and **DENIED** in part.  It is further

**ORDERED** that judgment shall enter in favor of defendant International

Playthings, LLC and against plaintiff Two Moms and a Toy, LLC on defendant's

counterclaim that the United States Patent No. 6,782,567 is invalid as obvious pursuant

to 35 U.S.C. § 103.  It is further

**ORDERED** that the Trial Preparation Conference Scheduled for December 7,

2012 and the trial set for February 4, 2013 are hereby **VACATED**.  It is further

**ORDERED** that this case shall be **CLOSED**.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendant may have its

costs by filing a bill of costs with the Clerk of the Court.

DATED October 24, 2012.

BY THE COURT:


  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge